**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X

In re: LIZA PRICE RAPPAPORT,                    Chapter 11

                Debtor.                    Case No. 11-37107 (CMG)

- - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

GORSKI & KNOWLTON, PC
Carol L. Knowlton, Esq.
Attorneys for the Debtor

WILENTZ, GOLDMAN & SPITZER, P.A.
Deirdre Woulfe Pacheco, Esq.
Brian J. Molloy, Esq.
Attorneys for The Ridge at Back Brook, LLC

**CHRISTINE M. GRAVELLE, U.S.B.J.**

I.      **INTRODUCTION**

       This matter comes before the Court at the request of Liza Price Rappaport ("Debtor") for

an order expunging the claims of The Ridge at Back Brook, LLC ("The Ridge"). The Ridge

claims damages for unpaid membership dues and argues that, if its contract with Debtor is

determined to be executory, it is also entitled to rejection damages arising from Debtor's

unauthorized resignation from The Ridge at Back Brook (the "Club"). Following trial, the Court

finds an executory contract between Debtor and The Ridge that Debtor rejected as of the filing

date, grants Debtor's motion to expunge claims numbered 2-1 and 2-2 as duplicative, denies

claim 16-1 as unsupported, and denies Debtor's motion to expunge claim number 15-1, instead

modifying and allowing claim number 15-1 as a general unsecured claim in the amount of

$283,677.79.

## II.    JURISDICTION AND VENUE

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and

157(a) and the Standing Order of the United States District Court dated July 10, 1984, as

amended October 17, 2013, referring all bankruptcy cases to the bankruptcy court.  This matter is

a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (B).  Venue is proper in

this Court pursuant to 28 U.S.C. § 1408.  The statutory predicates for the relief sought herein are

11 U.S.C. §365 and 11 U.S.C. § 502.  Pursuant to Fed. R. Bankr. P. 7052, the Court issues the

following findings of fact and conclusions of law.

## III.    PROCEDURAL HISTORY

Debtor filed a voluntary Chapter 11 bankruptcy petition on September 15, 2011 and

confirmed her First Modified Plan (the "Plan") approximately fifteen months later, proposing to

pay all creditors in full.  The Plan treats Debtor's contractual obligation to The Ridge as

unsecured, defines the contract as executory, and rejects it as of the effective date of the Plan.[1]

The Ridge objected to Debtor's characterization and claimed the contract could not be rejected as

executory.  The Plan, as confirmed, noted the dispute and explained that, if the Court found the

contract to be non-executory, payment of 100% of unsecured claims may prove impossible.

No claim had been allowed to The Ridge as of the confirmation date.  The Ridge filed a

proof of claim early in the case in the amount of $59,037.10, evidenced by a judgment entered

---

[1] At trial, Debtor argued that no contract existed because there was no meeting of the minds.  She made no such allegation in the Plan.

against Debtor in the Superior Court of New Jersey, Law Division, Hunterdon County.  The

Ridge amended its original claim prior to confirmation of the Plan[2], and filed two additional

claims just after confirmation.[3]

## IV.    FACTS DEVELOPED AT TRIAL

The Club is a private membership club offering an 18-hole golf course, practice range,

short game area, clubhouse with locker rooms, pro shop, golf cart storage, bar and grille, and

administrative offices.  See "The Ridge at Back Brook Membership Plan" (the "MP"), admitted

at trial as Exhibit D-1, at page 1.  The Ridge is the owner and operator of the golf course and all

other amenities offered to the members of the Club.  See id.  Joel Moore is the managing

member of The Ridge and shares ownership with his wife, Pamela Moore.  At trial, Mr. Moore

testified that the Club is a non-equity golf club, meaning that the land and facilities are owned

and operated by individuals or a company rather than by its members.  As such, the members of

the Club have no say in its operation.

Debtor testified that she joined the Club "the day [T]he Ridge broke ground," which she

believed was in 1998.  The only documents admitted into evidence that contained the Debtor's

signature were a Personal Information Profile for the Club, and a one-page Regular Membership

Agreement (the "Agreement"), dated November 15 and November 20, 2000, respectively.[4]  The

Agreement, which Debtor testified she read before signing, states that Debtor accepted

---

[2] The amendment, docketed as Claim 2-2, and in the amount of $81,112.26, added additional interest on the judgment and unpaid monthly dues and finance charges that accumulated pre- and post-petition.
[3] Claim 15-1, filed on 2/20/13 and in the amount of $525,786.05, calculated rejection damages consisting of monthly dues and expenses through 2030; Claim 16-1, filed on 2/25/13 and in the amount of $1,099,784.16, stated as its basis "contract rejection" damages (with 5% discount value).
[4] The Agreement estimated construction of the golf course would begin on or about November 6, 2000, which comports with Debtor's testimony that she joined "the day [T]he Ridge broke ground."

membership in the Club at the $65,000 deposit level.  Debtor began paying annual dues the year

the golf course opened for play as required in the MP.  MP at p. 6.

Joel Moore testified that the golf course opened in the summer of 2002 upon completion

of construction of nine holes.  Construction of the clubhouse had not begun because

memberships in the Club had not reached the levels required in the construction financing

documents for the project.  Because the members wanted to find a way to build the clubhouse

sooner, The Ridge developed an alternate financing plan whereby the members would contribute

directly to construction of the clubhouse.  The Ridge put the financing plan to a vote of the

members and it was accepted with 94% voting in favor.  As a result, the clubhouse opened in

2004.

The financing plan allowed the members to choose one of two options: to become an "A"

member by investing $25,000 toward construction costs, or a "B" member by paying $1,800

annually, which payments would be used to make interest payments on the "A" member

investments.[5]  All members would eventually be reimbursed for their contributions.  Members

who did not make a choice became "B" members by default.  Debtor testified she was not given

a choice as to the alternate financing options and that she was forced to become a "B" member.

On cross-examination, Debtor testified that she was not aware of the vote regarding the financing

or of the choice of investment options.  She admitted that she was willing to abide by a majority

vote of the members and, perhaps more importantly, admitted that she thought construction of

the clubhouse was a good idea.  She testified that, if she had known of the vote, she would have

voted in favor of member financing of construction.[6]

---

[5] The testimony is unclear as to the duration of the "B" member payments.  The calculations attached to proofs of claim filed by The Ridge, calculate payments through 2030.
[6] The Court is unclear as to Debtor's complaint with regard to the member financing.  If she had voted, she would have voted in favor.  If she chose option "A," she would have invested more into a club she is now trying to leave.

Through a certification in support of her motion to expunge the claim of The Ridge, which certification was admitted as an Exhibit at trial ("Debtor's Cert."), Debtor testified that she attempted to terminate her membership long before she filed bankruptcy.[7]  She testified that she enjoyed her membership privileges until October 2006 when she had major surgery that prevented her from golfing in 2007.  She notified the Club that she would be unable to play that year and the Club found a substitute member to pay her dues and use her membership.  Her medical problems continued to prevent her from using her membership and she testified that she again contacted The Ridge to request another substitute member.  According to the Debtor's Cert., she learned then that members can use substitute members only once.  She found someone willing to buy her membership, but was told she was not allowed to assign her membership.  Instead, The Ridge sold a membership directly to Debtor's contact.  Debtor certified that "The Ridge's contract…does not allow members to terminate."  Debtor's Cert. at ¶ 9.  Debtor testified that her medical problems worsened and she has not been able to use the Club facilities since 2007.

Mr. Moore testified that he and his wife came up with the substitute member plan to address member concerns.  They viewed it as a "win-win."  Allowing substitute members gave members the opportunity to take a one-year leave of absence from the Club, and allowed the Club to showcase its amenities to the substitute member for a year in the hope the substitute member would become a permanent member.

The parties did not direct the Court's attention to any document outlining the substitute member program other than a letter from Pamela Moore, Membership Director, to Debtor dated November 10, 2008, which was admitted into evidence.  In it, Ms. Moore tells Debtor that The

---

[7] There is conflicting testimony about Debtor's attempts to terminate her membership that will be discussed later in this decision.

Ridge extended an invitation for permanent membership to the person who assumed Debtor's membership for 2008.  She explains the one-year policy for "temporary membership."  Ms. Moore suggests that, if Debtor did not plan to return to The Ridge in 2009, she "may propose a different person to assume [her] membership in order to remain in good standing."[8]  Although the letter requests a response before December 1, 2008, Debtor replied in a writing dated December 6th.  In it, Debtor asks Ms. Moore to find another person to assume her membership for 2009.  She states that she would like to remain in good standing but that she needed to sell her farm before she could afford to pay dues again.

In the Agreement, Debtor acknowledged receipt of a copy of the MP and the Rules and Regulations ("R&R") for the Club, both of which documents were admitted as trial exhibits. Debtor testified that she also received a copy of the Confidential Private Placement Memorandum dated March 26, 1999 (the "Memorandum"), which she briefly reviewed before she decided to join the Club.

The Ridge moved the following membership documents into evidence:

- Regular Membership Agreement (signed by Debtor and referred to above as "the Agreement");

- Confidential Private Placement Memorandum (referred to above as "the Memorandum");

- Personal Information Profile (signed by Debtor and referred to herein as "Profile").

Debtor moved a document entitled "Membership Documents" into evidence.  The Membership Documents consisted of the MP, a ten page document; the Rules and Regulations, a thirteen page document (referred to above as "R&R"); and two Amendments to the Membership Documents dated July 14, 1999 and March 5, 2003, respectively.   The Debtor testified that she

---

[8] The suggestion is confusing as all other documents presented to the Court emphasize the inability of members to assign their memberships.

signed the July 1999 Amendment ("Amendment #1") but her signature was not presented at trial.

The March 2003 Amendment ("Amendment #2") did not have signature lines.  It stated that it

superseded any previous policy including Amendment #1.[9]

      To join the Club, a member was required to pay a deposit as specified in the MP.  MP at

p. 1.  No portion of the deposit would be refunded for thirty years unless the membership could

be re-issued to a new member.  Id. at pp. 1, 4.  Memberships would not be re-issued (or sold) by

the Club until all 275 memberships were sold.  Id. at pp. 2, 4.[10]  Memberships could be assigned

or transferred only to the Club.  Id. at p. 4.  Members were also required to pay annual dues, the

amount of which would be determined by the Club "from time to time."   Id. at p. 5.  The

obligation to pay could not be abated for any reason, "including, without limitation, extended

absences from the area or temporary disability."  Id.  The obligation to pay dues remained even if

a member were prohibited from using the Club facilities due to suspension or termination of their

membership by the Club.  Id.  The MP required that a member wishing to resign give notice, in

writing, thirty days prior to resignation.  Id. at p. 4.  Resigning members would be obligated to

pay dues until their memberships were re-issued, which could not occur until all memberships

were sold.  Id.  Resigning members would be excused from paying assessments approved after

the effective date of their resignation.  Id. at p. 5.  The Club maintained a list of resigned

members, kept in chronological order of the Club's receipt of a member's written resignation

notice.  Once the Club achieved full membership, memberships would be re-issued beginning

---

[9] The Agreement, the Memorandum, the Membership Plan, the Rules and Regulations, and the two Amendments will be collectively referred to herein as the "Contract."

[10] The Club reserved the right to increase the number of available regular memberships by ten as long as the added memberships did not degrade the quality of golf play. MP at p. 2.  It has seventeen additional memberships, ten of which could also be converted into regular memberships, and reserved the right to create "invitational memberships until regular memberships were sold out." Id. at p. 7.

with the first member on the resigned member list and would proceed chronologically in

accordance with the list.

The MP explained that membership in the Club provided "only a revocable license to use

the Club Facilities;" that members had "no right to vote, hold office, or otherwise be involved in

the operation or management of the Club;" and that the "Club reserve[d] the right, at any time

and in its sole discretion, to modify or amend all or any terms and provisions of the [MP and

R&R]." Id. at p. 6.[11]

Mr. Moore testified that The Ridge amended the MP twice, in response to members'

concerns about their ability to leave the Club if they were unable to take advantage of the

facilities for reasons beyond their control.  Amendment #1 allowed resignation if a member

relocated 100 miles or more from the Club, or if a member incurred a permanent medical

disability.  Amendment #2, also adopted in the sole discretion of The Ridge, extended the

mileage requirement to 200 miles and held the resigning member responsible for payment of

annual dues for the remainder of the calendar year in which he or she resigned and for the

following calendar year.  It required that the resigning member sell his or her personal residence

in connection with their relocation and defined the effective date of resignation as the date on

which the residence is sold.  Amendment #2 clarified that, unless a member resigned because of

relocation or a permanent medical disability, the member would be responsible for paying all

dues until their membership was re-sold by the Club.  It reiterated that no sales of existing

memberships could occur until the Club memberships were sold out.  See also MP at p. 4.

The Agreement, which Debtor signed, acknowledges that she received the MP and the

R&R.  It acknowledges that the membership deposit paid by Debtor will be repaid in accordance

---

[11] The MP provided for the establishment of an Advisory Board "to foster good relations between the [m]embers
and the management."  MP at p. 8.  According to Mr. Moore, the Board consists of Club members and meets with
Club management on a periodic basis to discuss operations, as provided in the MP.  Id.

with the terms of the MP and the R&R, upon her resignation from the Club in accordance with the terms of the MP and the R&R.

The Memorandum references the MP, explains the ownership structure of The Ridge, the plan to finance and construct a golf facility, and the relationship of The Ridge to the Club.  See Memorandum at pp. 3-4.  It outlines the intent of The Ridge to sell memberships and to use the proceeds to pay start-up expenses and to purchase real property for construction of the golf course.  Id. at p. 4.  It lists the types, numbers, and costs of available memberships and explains the number of memberships needed to be sold before the real estate could be purchased or construction of the golf course and clubhouse could begin.[12]  See id.  The Memorandum states that The Ridge "reserves the right to change, modify and/or adjust…[m]embership [d]eposit levels and the number of [m]emberships available at each level."  Id.

The Memorandum includes 17 paragraphs of "Risk Factors" on three full, single-spaced pages.  See id. at pp. 5-9.  It contains additional warnings in bold print on the first three pages. Those warnings include the following:

- THE PURCHASE OF A CLUB MEMBERSHIP INVOLVES SUBSTANTIAL ECONOMIC RISK AND POTENTIAL CONFLICTS OF INTEREST.

- TRANSFER OF CLUB MEMBERSHIPS IS SPECIFICALLY RESTRICTED UNDER THE TERMS OF THE MEMBERSHIP DOCUMENTS.  A CLUB MEMBER WILL BE REQUIRED TO RETAIN OWNERSHIP AND BEAR THE ECONOMIC RISK OF OWNERSHIP FOR AN INDEFINITE PERIOD.

The Profile, completed and signed by Debtor, acknowledges, among other things, that she received a copy of the Memorandum, that she is able to bear the economic risk of losing her

---

[12] The Memorandum provided for 275 memberships: 15 Charter and 260 Regular Memberships, with costs ranging from $30,000 to $80,000.00 in a total of 11 levels.  Memorandum at p. 4.  It explained that memberships would be offered for sale beginning with the least expensive level.  See id.  There were six membership levels sold out before Debtor purchased her membership at the $65,000.00 level, indicating that the Club had a minimum of 140 members at the time.  By the time Debtor joined, the Club had sold enough memberships to allow The Ridge to purchase the real estate and begin construction of the golf course in accordance with the Memorandum.

entire membership deposit, that she had adequate means of providing for her current needs and personal contingencies and had no need for liquidity with her membership deposit.  See Profile at p. 3 of 3.  The Profile further states that "Debtor ha[s] substantial experience in making decisions of this type" and "ha[s] consulted with [her] personal tax advisor and/or legal counsel in evaluating the merits and risks associated with acquiring a membership in the Club".  Id.  Debtor initialed each acknowledgement.  In the Profile, Debtor stated that she was the president of a company called "Amateur Golf Tournaments" and that she was also a member of TPC Jasna Polana, an exclusive private golf club in Princeton, NJ.

Debtor testified that she did not remember if she read the MP or R&R at the time she joined the Club, but she understood the language to mean The Ridge would employ fair business practices.  She remembered being given a copy of the Membership Documents on the day of the groundbreaking and that she took them home, glanced at them, and brought back a check for her membership deposit in the amount of $65,000.00 because "Nancy," the salesperson who represented The Ridge, said she needed a check.  According to Debtor, Nancy assured her that she needn't worry, memberships in the Club were sure to sell out within the next 2 years and she would get 70% of the new membership dues back.[13]  Debtor believed this to be true since The Ridge was such a beautiful golf course.

When she began to have medical problems, Debtor testified that she orally asked to be put on the resignation list and asked how she could get out of the Contract.  The testimony is in conflict with Debtor's note to Pam Moore dated December 6, 2008 wherein she wrote she "would like to remain in good standing" and asked that The Ridge find someone to assume her membership.  Debtor testified that she never expected that it would be impossible to resign from

---

[13] On cross examination, The Ridge pointed out that the Memorandum provides its terms cannot be changed by oral representations.  See Memorandum at p. 3 ("Any representations [whether oral or written] other than those contained herein or in documents . . . have not been authorized by the company and are not to be relied upon.")

the Club.  She testified that she understood that The Ridge had raised membership costs to a

level that would make it unlikely that the available memberships would ever sell out.  The fact

that The Ridge had sole control as to the price and sale of memberships meant it could continue

raising the price, making it impossible to sell all of the memberships and thereby forcing her to

remain a member forever.

Mr. Moore testified that, at the time of trial, the Club had 267 members, with 28[14] regular

memberships left to sell.  He explained that the terms of the MP, that held members to their

financial obligations until all available memberships were sold, were necessary to obtain the

financing needed to construct the facilities.  He explained that The Ridge had made changes to

the membership levels and types in order to attract more members.   For example, at the time of

trial, The Ridge was offering three levels of regular memberships: $75,000, which was 100%

non-refundable, $100,000, of which $99,000 was refundable, and $125,000, which would

participate in an appreciation plan.  He further testified that the Contract contained specific

requirements for resignation from the Club and that Debtor never met those requirements.  In

fact, he understood that Debtor wanted to remain in good standing, but claimed she could not

afford the dues.  According to Mr. Moore, the substitute member program was available to

Debtor but she only took advantage of it for one year.

Debtor stopped paying her dues in 2008.  The Ridge obtained a judgment against Debtor

in May 2011, in the amount of $58,307.24 representing unpaid dues for the period prior to that

judgment.  According to her First Amended Disclosure Statement, Debtor filed her Chapter 11

petition in September 2011 because she had lost money in real estate investments and The Ridge

had begun pursuing her for unpaid membership dues.

---

[14]The Ridge had increased membership capacity from 275 to 295 after Debtor joined the Club, in accordance with
the Contract.

## V.    <u>LEGAL ANALYSIS</u>

A.  <u>The Contract Between The Ridge and Debtor is Enforceable and Not the Result of Unconscionability or a Lack of Meeting of the Minds.</u>

i.    <u>The Contract Between Debtor and The Ridge Resulted from a Meeting of the Minds</u>

The Code provides that a claim may be disallowed if it is unenforceable against a debtor under any applicable law "for a reason other than because such claim is contingent or unmatured".  See 11 U.S.C. § 502(b)(1).  If Debtor is correct that there was no meeting of the minds or that the Contract is unconscionable, § 502(b)(1) would serve as the basis for disallowance of The Ridge's claim.

For a contract to be enforceable there "must be a 'meeting of the minds' for each material term to an agreement."  <u>Pacific Alliance Grp. Ltd. v. Pure Energy Corp.</u>, U.S. Dist. LEXIS 2246 at *8 (D.N.J. Jan. 23, 2006) (citing <u>Sampson v. Pierson</u>, 140 N.J. Eq. 524 (N.J. Ch. 1947)).  This requirement of a meeting of the minds is "an essential element to the valid consummation of any contract." <u>Ctr. 48 P'ship v. May Dep't Stores Co.</u>, 355 N.J. Super. 390, 406 (App. Div. 2002). A meeting of the minds occurs when there has been a common understanding and mutual assent to all the terms of a contract.  <u>Knight v. New England Mut. Life Ins. Co.</u>, 220 N.J. Super. 560, 565 (App. Div. 1987).  "The phrase 'meeting of the minds' can properly mean only the agreement reached by the parties as expressed, *i.e.*, their manifested intention, not one secret or undisclosed, which may be wholly at variance with the former." <u>Leitner v. Braen</u>, 51 N.J. Super. 31, 38 (App. Div. 1958).

Debtor argues that the terms of the Contract were so illusory that there could not have been a meeting of the minds.  The Contract gave The Ridge sole discretion to change any membership term, which it did on a number of occasions, including its incorporation of the substitute member plan and adoption of Amendments 1 and 2.  Debtor argues that, because she could not have known the terms that would be changed or added in the future, it would have been impossible to achieve the common understanding and mutual assent necessary for a meeting of the minds.  This Court finds that the terms of the Contract were very clear on its face.  Debtor testified that she received the Contract and knowingly signed documents  that would bind her to the Contract.  She knew, or should have known, that she was signing an agreement through which the "Club reserve[d] the right, at any time and in its sole discretion, to modify or amend all or any terms and provisions of the Membership Plan and Rules & Regulations."  She knew, or should have known, she was signing an agreement (1) through which memberships would not be re-issued until all existing memberships were sold; (2) through which members would be obligated to continue paying dues until such time as their memberships were re-issued; and (3) through which members were given no rights to hold office, vote, or be involved in the operation of the Club.  There is nothing to indicate that Debtor did not understand the terms of the Contract.

The Memorandum provided Debtor with a list of risk factors inherent in becoming a member.  One such factor specifically addressed the speculative nature of the membership, stating that the transfer of a membership was restricted and that "[a] club member will be required to retain ownership and bear the economic risk of ownership for an indefinite period."  Additionally, Debtor made representations during the membership application process which indicated that she had reviewed the membership documents with a tax advisor and/or counsel,

that she had sufficient assets to meet her expenses without the membership deposit and that she had experience with private golf club memberships. Despite the representations, she now states that she does not remember if she read these documents.

The fact that the terms of the Contract were subject to change does not mean that there was no meeting of the minds. Put another way, it has been demonstrated that there was mutual assent between The Ridge and Debtor to the term in the Contract whereby the Ridge was given the discretion to modify or amend any of the terms and provisions. It is disingenuous for Debtor to now say that, even though she understood that term at the time she signed the contract, that now, almost 14 years later, it was impossible for her to understand the true ramifications of that clearly defined provision. In no way did The Ridge attempt to hide this provision or word the provision in such a way as to make it misleading. Debtor had every opportunity to consider the ramifications of the provision, even certifying to reviewing it with a tax advisor and/or lawyer. Her choosing not to do so does not prevent a meeting of the minds.

ii.    The Contract Between Debtor and The Ridge Was Not Unconscionable

Unconscionability is an amorphous concept. See Kugler v. Romain, 58 N.J. 522, 543 (1971). It has been described as "overreaching or imposition resulting from a bargaining disparity between the parties, or such patent unfairness in the contract that no reasonable person not acting under compulsion or out of necessity would accept its terms." Muhammad v. County Bank of Rehoboth Beach, 379 N.J. Super 222, 236-37 (App. Div. 2005), rev'd on other grounds, 189 N.J. 1 (2006). In determining unconscionability, courts look to two factors: "(1) unfairness in the formation of the contract, and (2) excessively disproportionate terms." Delta Funding Corp. v. Harris, 189 N.J. 28, 55 (2006) (quoting Sitogum Holdings, Inc. v. Ropes, 352 N.J. Super. 555, 564 (Ch. Div. 2002)). The first factor can be termed "procedural unconscionability,"

and considers inadequacies such as "age, literacy, lack of sophistication, hidden or unduly

complex contract terms, bargaining tactics, and particular setting existing during the contract

formation process." Id. (citations omitted).  The second factor, labeled "substantive

unconscionability," relates to the substantive unfairness of the agreement, and asks the court to

consider whether, "the exchange of obligations is so one-sided as to shock the court's

conscience." Id.

Courts have generally taken three approaches to unconscionability determinations, as

noted in Sitogum Holdings, Inc. v. Ropes, 352 N.J. Super. 555 (Ch. Div. 2002).  The Sitogum

Court analyzed these approaches and found that most courts have looked for a showing of both

procedural and substantive unconscionability.  Id. at  565 (citations omitted).  Some courts

require only substantive unconscionability.  Id. (citations omitted).  Other courts use a "sliding

scale" approach, weighing the two factors together, where a relatively minor showing of one

factor can be outweighed by a large showing of the other.  Id. at 565-66.  (citations omitted).

This Court cannot find the Contract to be unconscionable due to its wording.  Procedural

unconscionability simply does not exist in this case.  Debtor is not illiterate or unsophisticated.

She is an intelligent woman, who was already a member of another exclusive golf club in the

area.  She testified that she organized amateur golf tournaments and disclosed on the Profile that

she owned a company called "Amateur Golf Tournaments".  She clearly has some familiarity

with the organization and operation of golf clubs.  The Contract terms were clearly and carefully

presented to her.  Even if the Contract was presented to Debtor as "take-it-or-leave-it,"

this was not a result of unequal bargaining power.  There are hundreds of private golf courses

within the immediate area of Debtor.  If she was not satisfied with the terms presented by The

Ridge, or if she truly was leery of entering into a contract where The Ridge could change any

terms at its discretion, then she had the option of taking her business to any of those other golf

clubs.  In fact, as stated, Debtor already belonged to another club.  The Court finds she willingly

and freely entered into the Contract.

Substantively, the issue is much closer.  One can imagine countless scenarios whereby

The Ridge could take advantage of the open-ended term allowing it to change the Contract in its

sole discretion.  Debtor's hypothetical whereby The Ridge could raise the annual dues to

$1,000,000 yearly is well taken even though common sense should prevent The Ridge from

making such a change.  Ultimately, the fact that The Ridge may do so does not shock the

conscience of this Court.  As already described, this sophisticated Debtor knew, or should have

known, the terms and conditions of the Contract, and willingly entered into it.  Debtor did not

have a problem with the terms of the Contract for the years during which she used the Club

facilities, even after The Ridge amended the MP on two occasions and instituted a financing plan

for construction of the clubhouse, to which Debtor made payments as a "B" member.  Only now

is she belatedly attempting to void the Contract.  This Court will not allow such a result.[15]

The Contract is valid and enforceable as written, and is not unconscionable, nor was there an

absence of a meeting of the minds.  Accordingly, the claim of The Ridge will not be expunged.

B.  <u>The Contract Between Debtor and The Ridge is Executory</u>

Finding that a contract exists between Debtor and The Ridge, the Court must determine

whether it is executory.  The Plan explains that The Ridge asserts the Contract is non-executory

and cannot be rejected, and notes that if the Court agrees with The Ridge, "there may not be

---

[15] Because we find that there has been neither procedural nor substantive unconscionability, it is not necessary to determine which of the competing approaches for determining unconscionability, as articulated in <u>Sitogum</u>, is the proper standard, and we will not address the issue.

enough money to pay unsecured creditors 100% of their claims."  The Plan estimates allowed

unsecured claims at $123,000, including the amended claim of The Ridge, which, at the time of

confirmation, totaled $81,112.26.  The Court asked the parties to brief the issue and the Debtor

presented her legal analysis.  The Ridge chose not to address it beyond its statement that the

Contract was not executory and could not be rejected.

Under the Code, a debtor may assume or reject an executory contract.  11 U.S.C. §365(a).

If the contract is not executory, the debtor does not have this option.  See In re Columbia Gas

Systems, Inc., 50 F.3d 233, 239 (3d Cir. 1995).  While there is no definition of executory

contract in the Code, the Third Circuit defines an executory contract as "a contract under which

the obligation of both the bankrupt and the other party to the contract are so far underperformed

that the failure of either to complete performance would constitute a material breach excusing the

performance of the other."  In re Exide Tech, 607 F.3d 957, 962 (3d Cir. 2010) (citing In re

Columbia Gas Systems, Inc., supra, 50 F.3d at 239); see also Sharon Steel Corp. v. Nat'l Fuel

Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989).  This is an adaptation of the definition set

forth by Vern Countryman in an oft-cited law review article.  See Vern Countryman, Executory

Contracts in Bankruptcy, Part 1, 57 Minn. L. Rev. 439, 460 (1973).  The Third Circuit explains

that, "unless both parties have unperformed obligations that would constitute a material breach if

not performed, a contract is not executory under section 365."  See In re Exide Tech, supra, 607

F. 3d at 962.  The time for determination of whether there are material unperformed obligations

of both parties to a contract is as of the entry of the order for relief.  See id.

To determine whether a breach is material, the Court must look to state law.  See General

Datacomm Indus. v. Arcara, (In re General Datacomm Indus.), 407 F.3d 616, 627 (3d Cir. 2005).

New Jersey law recognizes that a material breach of contract on the part of one party entitles the

other party to terminate it.  See <u>Ross Systems v. Linden Dari-Delite</u>, 35 N.J. 329 (1969); see also

<u>Young Travelers Day Camps, Inc. v. Felsen</u>, 118 N.J. Super. 304 (App. Div. 1972).  A breach is

material if it goes to the essence of the contract.  See, generally, <u>Ross Systems</u>, *supra*, 35 N.J. at

341; accord 2 <u>Restatement, Contracts</u> (1932) § 399 at 274-276.  Whether a breach is material is a

question of fact.   See <u>Magnet Resources, Inc. v. Summit MRI, Inc.</u>, 318 N.J. Super 275 (App.

Div. 1998); see also <u>Farnsworth on Contracts</u> § 8.16 (1990).

> New Jersey courts have further described "material breach" as follows:

> > Where a contract calls for a series of acts over a long term, a material
> > breach may arise upon a single occurrence or consistent recurrences which
> > tend to "defeat the purpose of the contract" [citation omitted]. In applying
> > the test of materiality to such contracts a court should evaluate "the ratio
> > quantitatively which the breach bears to the contract as a whole, and
> > secondly the degree of probability or improbability that such a breach will
> > be repeated.

<u>Magnet Resources, Inc.</u>, *supra*, 318 N.J. Super at 286 (citing <u>Medivox Productions, Inc.</u>

<u>v. Hoffman-La Roche, Inc.</u>, 107 N.J. Super 47, 59 (Law Div. 1969)).

> In the case before the Court, both Debtor and The Ridge have obligations to each other

that are underperformed.  The obligations go to the essence of the Contract.  Debtor is obligated

to pay annual dues and any assessment made by the Club unless and until she terminates her

membership in accordance with the Contract.  The Club relies on the payment of dues and

expenses to fund its operation.  Debtor has not made a payment in a number of years and, as she

admits in the Plan, hopes to terminate the Contract and limit her liability.  The Ridge has an

obligation to maintain and operate its 18 hole golf course and clubhouse for the use of its

members.  While not an express provision of the Contract, The Ridge also has an obligation to

continue to solicit members until it reaches full capacity as defined in the Contract, and then to

maintain it membership levels to support its business purpose as set forth in the Contract.  These reciprocal obligations go to the heart of the Contract and are, therefore, material.

We note that The Ridge chose not to terminate Debtor's membership when she stopped paying dues, instead choosing to obtain a collection judgment against her.  While this fact may indicate that The Ridge did not treat Debtor's failure to pay as material breach of the Contract, it does not instruct this Court's analysis of materiality as it relates to the determination of whether the Contract is executory under the Code.  Both the Third Circuit and New Jersey courts recognize that a party injured by a material breach need not choose to terminate the contract and may decide to pursue damages as its only course of action.  See Aetrex Worldwide, Inc. v. Sourcing for You Consulting, 2013 U.S. Dist. LEXIS 54943 at *13-14 (D.N.J. Apr. 16, 2013); Frank Stamato & Co. v. Borough of Lodi, 4 N.J. 14 (1950).  "In a case of 'a material breach of contract which does not ... indicate any intention to renounce or repudiate the remainder of the contract … the injured party has a genuine election offered him of continuing performance or of ceasing to perform and any action indicating an intention to perform will operate as a conclusive choice, not indeed depriving him of a right of action for the breach which has already taken place, but depriving him of any excuse for ceasing performance on his own part."  See Frank Stamato & Co., supra, 4 N.J. at 21 (citing 5 Williston on Contracts (rev. ed.) 3749).

The Contract incorporates this choice.  The contractual obligations of The Ridge require it to continue performance even if one member fails to pay, since its obligations remain to other members.  In addition, the Contract provides that a suspended member's privileges will be restored if their account is brought current.  The Contract allows the Club to suspend or terminate a non-paying member's club privileges, but it does not release that member from her obligation to continue paying dues.  Unpaid dues and assessments continue to accrue.  Her

continuing failure to pay does not become any less material.  In other words, substantial

obligations remain to be performed by both parties to the Contract.  The Contract is executory.[16]

### C.    Rejection Does not Terminate the Contract

The Code states that if a debtor chooses to reject an executory contract before

assumption, that rejection will be deemed as "constitut[ing] a breach of such contract or lease . . .

immediately before the date of the filing of the petition."  11 USC §365(g)(1).  The

overwhelming majority of courts addressing the issue, including many courts within the Third

Circuit, hold that rejection under §365 does not equate to termination of a contract.  See, e.g., In

re CB Holding Corp., 448 B.R. 648,686-87 (Bankr. D. Del 2011) (well settled that lease rejection

pursuant to § 365 results in prepetition breach; not termination); In re Grand Union, 266 B.R.

621, 627 (Bankr. D.N.J. 2001) (readily evident that rejection of executory contract not

termination but breach under § 365(g)(1)).  This holding is further defended by the Fifth Circuit,

explaining that "[t]o assert that a contract effectively does not exist as of the date of rejection is

inconsistent with deeming the same contract breached.  Furthermore, a party aggrieved by

contract rejection may assert a claim for damages," pursuant to 11 U.S.C. § 502.  O'Neill v.

Cont'l Airlines, Inc. (In re Cont'l Airlines), 981 F.2d 1450, 1460 (5th Cir. 1993).

Debtor misapplies the Third Circuit's opinion in Sharon Steel when she argues that it

excuses her from any further obligation to The Ridge.  See Sharon Steel Corp., supra, 872 F.2d

at 40 (rejection of service agreement under § 365 merely relieves parties from their respective

obligations under the contract).  In Sharon Steel, the debtor filed its bankruptcy petition

---

[16] There are very few reported cases analyzing the nature of the membership contract between a debtor and a private golf club.  Most of the cases reviewed by this Court address issues arising when a private golf club files for bankruptcy protection.  Debtors involved in the latter have entirely different concerns.  The only case found in the former category held the membership contract to be executory.  See Rieser v. Dayton Country Club Co. (In re Magness), 972 F.2d 689 (6th Cir. 1992).  In that case, the Chapter 7 trustee attempted to assume and assign the golf membership.  The Magness court denied the trustee's motion to assume and assign for reasons unrelated to the executory analysis.

approximately seven months before its eleven year contract with National Fuel Gas Distribution

Corp. ("NFG") was set to expire by its terms.  The Third Circuit found the contract to be

executory, and held it rejected as of the date of the filing.  In so holding, the court found NFG

had no claim for an allowance of administrative expenses at the amount set in the contract.  The

Third Circuit did not address rejection damages, which would be treated as an unsecured pre-

petition claim and which are necessarily calculated by valuing the benefit of the unperformed

obligations of the breaching party.   Instead, the question presented to the court in Sharon Steel,

was the amount to be paid for natural gas supplied to the debtor after the entry of the order for

relief.  NFG argued that payment should be made at the contract rate, which was higher than the

rate approved by the Pennsylvania Public Utilities Commission at the time.  Since the court held

the contract executory and allowed its rejection pre-petition as a benefit to the estate, there was

no basis to apply the contract rate post-petition.  See id. at 41.  This result is in keeping with the

court's holding that rejection relieves the parties from their respective obligations.

      After an executory contract is rejected, the remedy available to the non-debtor party is a

claim against the estate under 11 USC §502(g), which provides that:

> A claim arising from the rejection, under section 365 of this title or under
> a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract
> or unexpired lease of the debtor that has not been assumed, shall be
> determined, and shall be allowed under subsection (a), (b), or (c) of this
> section or be disallowed under subsection (d) or (e) of this section, the
> same as if such claim had arisen before the date of the filing of the
> petition.

The language in section 502(g) is unambiguous and contains a clear command that all claims

arising out of rejected executory contracts are subject to allowance or disallowance under 11

USC §365(a)-(e).  See Durkin v. Benedor Corp. (In re G.I. Indus.), 204 F.3d 1276, 1281 (9th Cir.

2000).

> Rejection does not . . ., cause an executory contract to vanish or become unenforceable against the debtor, and is not a matter of the "debtor reject[ing] its obligation." It is the estate's decision to decline the asset, leaving the liabilities of the debtor intact to form the basis of a claim
>
> ***
>
> Rejection establishes that the estate will not become obligated on the contract; it does not affect the continued existence of the debtor's obligations, which form the basis of the non-debtor's claim.

Michael T. Andrew, Executory Contracts in Bankruptcy: Understanding 'Rejection', 59 U Colo L Rev 845, 888 (1988).

Debtor argues that her rejection of the Contract equates to a termination of her obligations under that Contract. This Court disagrees, and finds that her rejection constitutes a breach of the Contract from which damages must be calculated pursuant to the Contract from the date immediately before the filing of the petition. Debtor's rejection of the Contract relieves her of the obligations imposed on her by the Contract. But, she confuses the extent of that relief. For example, if The Ridge sought allowance of an administrative claim for dues and assessments due post-petition, it would be prevented from doing so as the Contract has been rejected and The Ridge provided no benefit to the estate. See 11 U.S.C. §503(b) (allows payment of administrative expenses, including actual necessary costs of preserving estate). It does not mean that The Ridge is not entitled to compensation for damages it suffered as a result of Debtor's breach. The benefit of rejection to a debtor is that those damages are treated as an unsecured claim. In most Chapter 11 cases, unsecured claims are paid a small percentage of their actual value.[17]

---

[17] This Court notes that the Plan provides for full payment to unsecured creditors. Therefore, the amount awarded by this Court in rejection damages must be paid in full as required in the Plan.

D.    <u>Damages</u>

i.    <u>Overview</u>

Section 502(c) of the Code provides:

There shall be estimated for purposes of allowance under this section…

(1) any contingent or unliquidated claim, fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . .

The Code is silent as to the manner in which contingent or unliquidated claims are to be estimated.  See <u>Bittner v. Borne Chemical Co.</u>, 691 F.2d 134, 135 (3d Cir. 1982).  Despite the lack of express direction on the matter, the Third Circuit is, "persuaded that Congress intended the procedure to be undertaken initially by the bankruptcy judges, using whatever method is best suited to the particular contingencies at issue.  The principal consideration must be an accommodation to the underlying purposes of the Code."  <u>Id.</u>  However, in estimating a contingent or unliquidated claim a court is still bound by the legal rules which may govern the ultimate value of the claim.  <u>Id.</u>  "There are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the Code"  See <u>id.</u> at 136.

New Jersey law provides some guidance.  One who breaches a contract is liable for "all of the natural and probable consequences of the breach of that contract."  <u>Pickett v. Lloyd's</u>, 131 N.J. 457, 474 (1993).  Where a wrong has been committed resulting in damages, mere uncertainty to the amount will not preclude recovery; courts will fashion a remedy even though the proof of damages is inexact.  See <u>Albermarle Paper Co. v. Moody</u>, 422 U.S. 405, 418-419 (1975); <u>Tessmar v. Grosner</u>, 23 N.J. 193, 203 (1957).

The Court is well within its powers to make a determination of the claims filed by The Ridge.  The Contract has several contingencies and unknown factors that may remain unknown

for some time.  In the interest of administering the estate in a timely fashion, it falls on the Court

to estimate the value of the claims.  The Court heard the testimony of Mr. Moore, wherein he

explained the calculations behind the proofs of claim, and Debtor's arguments with regard to

estimation.

　　　Not surprisingly, the two sides have very different views of the correct amount of any

damage award.  Debtor suggests that the Court has great discretion as to what damages are

appropriate under the circumstances.  She argues that in determining damages, "the court 'is

permitted to make the most intelligible and probable estimate which the nature of the case will

permit, given all the facts and circumstances having relevancy to show the probable amount of

damages suffered."  See In re Stone & Webster, Inc., 279 B.R. 748, 794 (Bankr. D. Del. 2002)

(quoting Prombiant v. Blue Cross/Blue Shield of Maine, 562 A.2d 656, 660 (Me. 1989)).  Debtor

asks the Court to consider several factors when calculating the claim, including:  (1) the benefit

to the estate from the rejection; (2) The Ridge's failure to mitigate damages; (3) a one-year limit

on rejection damages; (4) denial of post-petition interest; and (5) credits to Debtor for payment

of the membership fee and "B" member interest payments.

　　　The Ridge argues that the Court need not estimate rejection damages because Mr. Moore

has already calculated the amount due to compensate The Ridge for Debtor's breach.  It argues

that its damage calculations are clear and definitive, therefore no estimation is needed.  It claims

the cases cited by Debtor are factually distinguishable.

　　　The arguments of both parties are flawed.  While we address many of Debtor's specific

arguments below, her argument that the Court has a general equitable power to re-write the

Contract is incorrect.  In Bittner, the Third Circuit makes clear that the Court must honor a claim

for breach of contract in accordance with accepted contract law.  Bittner, supra, 691 F.2d at 136.

This Court will not disregard or rewrite a contract negotiated at arms-length, the terms of which were understood by each party, solely to assist Debtor.  On the other hand, The Ridge overstates the simplicity of its calculations.  There are several factors which makes its claim contingent and unliquidated.  For instance, the claim calculation assumes membership through 2030 and makes several other assumptions to enhance its value.  It assumes that Debtor will not be permanently disabled in the next 16 years.  It assumes that Debtor will not move more than 200 miles away in the next 16 years.  It assumes that The Ridge will not sell out its memberships and begin to re-issue same.  Granted, The Ridge makes those assumptions because at the time of the rejection of the lease (the date of the filing of the petition), none of those factors were true.  However, assuming the worst serves only to benefit The Ridge by calculating the *maximum* in damages, and not necessarily what its damages may have been as of 2030.  As the Contract was rejected but not terminated, Debtor may still have had these options to limit her damages.

Additionally, The Ridge asserts that its claim is not speculative.  But, in addition to the factors noted above, it also assumes a dues increase of approximately $1,000 per year every three years.  Mr. Moore certified in support of the proof of claim that, "the dues projections are conservatively estimated by extrapolation from current dues levels with minor adjustments for inflation once every five years starting five years from now."  Not only does Mr. Moore's statement contradict the filed proof of claim, which appears to raise the dues by $1,000 per year every three years starting in 2016, but it also contradicts his testimony.  During that testimony Mr. Moore was rightfully proud of the fact that he had managed to keep raises in dues to a minimum at The Ridge.  He stated that over the last 7 to 8 years the dues have increased by only $1,010, something he believes not many golf courses could state.  Additionally, he testified that he believed that dues actually decreased one year.

While The Ridge may be an outlier among golf clubs in terms of keeping dues static over its history, it is now the victim of its own success.  It cannot point to a history of minor dues increases, yet file a proof of claim in which the increases in dues occur at a far higher level than that history.  This is especially untoward when the testimony of Mr. Moore indicated that theoretically, as The Ridge gains more members, the dues would go down.  Yet the proof of claim seeks to significantly increase dues over the next 16 years.  Therefore, it is left to this Court to estimate the claim due.  Before doing so, we will address the factors which the Debtor asks the Court to consider in its calculation.

     a.   Benefit to the Estate

Debtor argues that in rejecting the Contract, she now receives no post-petition services from The Ridge.  In calculating damages at the full amount of what she would have paid, she is gaining no benefit, thus defeating the purpose of § 365.  In support she cites to Sharon Steel for the proposition that § 365 is meant to help debtors reorganize their affairs by sloughing off burdensome executory obligations.  See Sharon Steel, 872 F.2d at 38, and this Court's discussion of same, *supra*.  Nevertheless, Debtor has made a business judgment to reject the Contract, and misinterprets the role of a "benefit to the estate" analysis when calculating rejection damages. As noted by a well-regarded law review article on the subject:

> Rejection is merely the trustee's business judgment that the estate should not assume the burden of an executory contract as an administrative expense. Thus, the non-debtor party has an unsecured claim for such nonperformance instead of an administrative expense claim. It is often not advisable for a trustee or debtor-in-possession to assume and obligate itself to pay the obligation in regular U.S. dollars as opposed to rejecting and turning the claim into an unsecured claim payable in what are usually attenuated "bankruptcy dollars" (i.e., paying 10 [cents] on the $ 1.00 is probably above average in most chapter 7 cases).

Jay Lawrence Westbrook, <u>A Functional Analysis of Executory Contracts</u>, 74 Minn L Rev 227, 252-53 (1989).

The benefit of rejection then, is the potential elimination of an administrative claim against the estate and the opportunity to discharge allowed rejection damages through confirmation of a plan that pays less than 100% to unsecured claimants.  In this case, there appears to be substantial equity in Debtor's properties, which may result in payment in full of the claim for rejection damages.  The Plan explains that if The Ridge prevails on its allegation that the Contract is not executory, there may not be sufficient money to pay the unsecured creditor class 100%.  This opinion, while finding the contract to be executory, has also found a substantial unsecured claim for The Ridge.[18]  This may result in the necessity of the filing of a modified plan.  However, it is Debtor who has asked for this rejection in her business judgment.  It may still be possible for her to discharge a portion of this obligation.

        b.   <u>Failure to Mitigate</u>

Debtor further argues that The Ridge has a duty to mitigate its damages, and has not done so because it did not allow Debtor to bring in a replacement member to take her position at the club.  "It is well settled that injured parties have a duty to take reasonable steps to mitigate damages."  <u>Ingraham v. Trowbridge Builders</u>, 297 N.J. Super. 72, 82 (App. Div. 1997)(quoting <u>McDonald v. Mianecki</u>, 79 N.J. 275, 199 (1979).  "Damages will not be recovered to the extent that the injured party could have avoided his losses through reasonable efforts 'without undue risk, burden, or humiliation.'"  <u>Id.</u> at 82-83 (citing <u>Restatement (Second) of Contracts</u>, §§ 350(1), (2) (1981)).

---

[18] If this Court accepted The Ridge's position that the Contract is not executory, its allowed pre-petition claim would be substantially lower than the claim allowed as a consequence of rejection.  Further, it is unlikely that an administrative claim would be allowed as Debtor's golf membership provided no benefit to the estate.

Debtor asserts that, once she informed The Ridge that she could not afford to be a

member and provided The Ridge with a replacement member, The Ridge's duty to mitigate

dictated that it release her from all future performance obligations under the Contract.  The

Ridge, while agreeing that it has a duty to mitigate damages, argues that it has done everything in

its power to mitigate.  It asserts that accepting the replacement member in full satisfaction of

Debtor's contractual obligations would be a breach of its own obligations to its other members in

favor of Debtor.  The Ridge points out that the Contract does not allow such replacement or

substitution until all memberships are sold.

This Court agrees with The Ridge.  The membership documents clearly indicate that

memberships cannot be reissued until the Club reaches full membership.  Sale of memberships

by anyone other than The Ridge is not permitted.  Resignation requires each member to follow

certain procedures, and even then could not occur until certain conditions regarding membership

had been met.  Allowing Debtor to substitute a new member in her place would effectively allow

her to jump the members who had followed the proper procedures for resignation, and

circumvent the explicit terms of the Contract.  Each member of the Club is bound by the same

terms and conditions, yet Debtor claims that The Ridge, in failing to give her special treatment,

did not mitigate its damages.  Yet, The Ridge has done its part in actively soliciting new

members and working to gain full membership, at which point the re-issuance of memberships

would be an option.

The Court notes that Debtor has taken no steps to mitigate her own damages.  At the time

of the evidentiary hearing and post-hearing briefing, she had not provided proof of a permanent

disability.  She had not moved more than 200 miles away, though she claims that is her intent.

Either of these circumstances would have terminated the Contract pursuant to its terms.  She had

not sought additional one-year replacement members, even though Pamela Moore suggested, by

letter, that she do so. She had not asked to be placed on the waiting list to resign her membership

once the Club reached full capacity.  To now argue that The Ridge is not properly mitigating

damages is disingenuous.[19]

c.   <u>One Year Limit on Rejection Damages</u>

Debtor asks the Court to be guided by 11 U.S.C. § 502(b)(6), which limits

rejection damage claims as follows:

> "if such claim is the claim of a lessor for damages resulting from the termination
> of a lease of real property, such claim exceeds:
>
> (A) The rent reserved by such lease, without acceleration, for the greater of
>     one year, or 15 percent, not to exceed three years, of the remaining
>     term of such lease, following the earlier of-
>
>     (i)    The date of the filing of the petition; and
>     (ii)   The date on which such lessor repossessed or the lessee
>            surrendered the leased property."

The statute cited is specific to leases.  Debtor has provided no support for her contention that a

one-year limit should be applied in this, non-lease, scenario.  As such, the Court rejects Debtor's

request that the terms of §502(b)(6) be factored into our calculation.

d.   <u>Interest Calculations</u>

It is not in controversy that The Ridge holds a pre-petition judgment against Debtor,

which accrued interest at the state court judgment rate until the petition date.  The parties

disagree, however, on whether The Ridge is entitled to post-petition interest on the judgment.

Debtor argues that the judgment is unsecured, and therefore not subject to interest.  The Ridge

---

[19] The Court again notes that Debtor never made clear to The Ridge her alleged intention to terminate her membership.  According to the testimony and written correspondence admitted at trial, it appeared the Debtor made clear that she could not afford dues, but wanted to remain in good standing at the Club.

argues that New Jersey law provides that a docketed judgment constitutes a lien.  Both parties are correct.

The Ridge correctly notes that its judgment constitutes a lien but it fails to recognize that a judgment creditor must take additional steps to perfect its lien through levy upon the property in order to achieve secured status.  See In re Italiano, 66 B.R. 468, 476-77 (Bankr. D.N.J. 1986).  While The Ridge contends it "followed applicable Court Rules in scheduling supplemental proceedings," it has not articulated how it perfected its lien to obtain secured status.

The Code provides that unmatured interest be disallowed.  See 11 U.S.C. § 502(b)(2); see also,  In re W.R. Grace & Co., 475 B.R. 34, 165 (D. Del 2012), citing United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 372-73 (1988) (general rule in bankruptcy is that "unsecured creditors are not entitled to recover post-petition interest"); In re Washington Group Intern., Inc., 432 B.R. 282 (D. Nev.2010) (Code prohibits claims for post-petition interest on unsecured claims); In re United Artists Theatre Co., 406 B.R. 643 (Bankr. D. Del. 2009) (interest on judgment which was unsecured claim accrued only to date of petition).  In liquidating interest-bearing claims, the computation of interest must be made as of some fixed date.  Bankruptcy law selects the petition date and disregards, for purposes of the liquidation of the debtor's assets, interest accruing beyond that date.  See 4 Collier on Bankruptcy, ¶ 502.03[3][b][ii] (16th ed. 2014), citing Vanston Bondholders' Protective Comm. v. Green, 329 U.S. 156 (1946) (use of petition date technical policy device used to cope with debtor's insolvency in most convenient, equitable and economical way).  The principle that interest stops running from the date of the filing of the petition can be viewed as a bankruptcy rule of liquidation rather than as a rule of substantive law.  See 4 Collier on Bankruptcy, *supra*, citing Bursch v. Beardsley & Piper, 971 F.2d 108 (8th Cir. 1992);  In re Hanna, 872 F.2d 829 (8th Cir.

1989) (because general rule disallowing unmatured interest is rule of administrative convenience

and fairness to all creditors, when concerns for such convenience and fairness not present, post-

petition interest may be allowed).[20]

The pre-petition judgment obtained by The Ridge was an unsecured claim as of the filing

date.  Therefore, The Ridge is not entitled to post-petition interest on the judgment.

The spreadsheet attached to the proof of claim filed by The Ridge includes a column

titled "Dec 31 Interest Calculation."   The column includes a charge of 1.5% for each unpaid

dues installment and Option B payment, and an additional charge of 18% for "Interest on Unpaid

Dues & Option B from Prior Years."  The Court finds no basis for an award of interest.  The

Contract provides for a service fee of 1.5% per month on unpaid dues, but does not include an

interest obligation.  See R&R at p. 3.  The service fee is not the equivalent of contractual interest

and is contingent on Debtor's continuing failure to pay through 2030.  In other words, the service

fee had not matured as of the filing date.  Further, a service fee is intended to compensate the

payee for the additional administrative work required to track and collect the unpaid obligation.

In this case, the Court fixes a single amount due to compensate The Ridge for Debtor's breach,

thereby eliminating the need for future recordkeeping.  It is inappropriate to include the service

fee in the claim calculations.

e.   Credit for Deposits

Debtor's final argument is that she should be entitled to a credit for her membership

deposit and "B" member interest payments when calculating rejection damages.  The Ridge

---

[20] If the debtor is solvent, interest may accrue on unsecured claims.  See W.R. Grace & Co., 475 B.R. at 165, citing, In re Washington Mutual, Inc., 461 B.R. 200, 240 (Bankr. D. Del. 2011).  Collier recognizes that disputes like the one before this Court are often academic because creditors receive less than they are owed in most cases.  See 4 Collier, supra, citing Bruning v. United States, 376 U.S. 358 (1964); In re John Osborne's Sons & Co., Inc., 177 F. 184 (2d Cir. 1910).  The Ridge did not develop any argument for post-petition interest based on Debtor's solvency or concerns of convenience and fairness.  Therefore, the Court will not consider allowance of post-petition interest on those grounds.

counters that the Contract calls for a return of the membership deposit only when that member becomes eligible.  Eligibility for refund requires that the member's name be at the top of the resignation list and that the member be in good standing.  The Ridge notes that Debtor is not currently on the resignation list nor is she in good standing.

But, the Contract provides that "[t]he Club shall repay to each Member one hundred percent (100%) of the Membership Deposit, without interest, thirty (30) years from the date that the Membership deposit was paid to the Club."  See <u>MP</u> at p. 2.  There appears to be no qualification or restriction on this provision.  To argue that the Debtor must pay rejection damages in full pursuant to her bankruptcy, and to calculate said damages far into the future, but not credit Debtor with a deposit that is meant to be returned, stretches this Court's definition of equity.  To be sure, we do not seek to re-write the Contract, but for the purposes of claim estimation under 502(c) we will credit Debtor with the present value of the membership deposit and the "B" member interest payments she made, said "B" payments also subject to reimbursement.

     ii.    <u>Calculation of Damages</u>

As a final matter, pursuant to the discussion above, the Court must wade into the murky waters of estimating the Ridge's claim for damages under section 502(c).  In doing so, we attempt to balance the competing interests of the parties: that of The Ridge in receiving its expected benefits of the Contract as if it had been fully performed, and of Debtor in achieving a fresh start, free of a burden that provides no benefit to her.  We recognize our limitations in the field of accounting, but shall make what we feel is a proper estimation based on the facts available to the Court.

We note again the extremely speculative nature of the Contract.  There are many variables which may occur in the future that would change the obligations of the parties.  The Ridge could gain full membership at any time.  Debtor could move more than 200 miles away, as she has stated she intends to do.  Debtor could become permanently disabled.  Dues could rise or fall in any given year.  In an attempt to account for these variables, we set the claim as unsecured in the amount of $283,677.79.  We briefly address the rationale behind this figure for the parties' understanding.

The Ridge projects damages in its proof of claim to 2030, which is the full term of Debtor's membership, assuming she never meets the requirements for resignation.  Additionally, even if she were to resign, she would be bound to wait for reimbursement or other relief until The Ridge attained full membership and sold such additional memberships that would allow relief to those members whose names appear before Debtor's on the waiting list.  It is apparent from the testimony of Mr. Moore that he is working diligently towards obtaining the goal of full membership prior to the 2030 date.  Therefore, we are comfortable limiting the damages to a period of 14 additional years, through 2028, as opposed to 2030.  We expect that, by 2028, Debtor would have taken the proper steps to resign and membership would be at a level where it would be possible to excuse her from the obligation to pay dues and to reimburse her deposit and "B" member payments.

The proof of claim also calculates raising dues in the amount $1,000 per year every three years.  As discussed, this is in contrast with the testimony of Mr. Moore, who states that the dues had only been raised $1,010 in the past 7 or 8 years, and that with more members, dues could be kept down.  Therefore, the Court is also comfortable in setting the dues at the current rate of $14,000 per year from 2012 to and including 2018, at $15,000 per year from 2019 to 2023, and

33

at $16,000 per year from 2024 to 2028.  The "B" payments would be factored in at $1,800 per year, beginning in July 2011.  Based on the Court's calculations, from the petition date through 2028 Debtor would owe approximately $284,800 in dues and "B" payments.  In addition, the Ridge is further entitled to its judgment amount plus taxed costs and judgment interest through the petition date, said sums totaling approximately $59,037.10.[21]  The total of the pre-petition judgment, with interest, to the petition date, plus breach of contract damages is $343,837.10.

However, as discussed above, the Debtor is entitled to a credit for her $65,000 membership deposit, discounted to present value at $28,359.31,[22] and $31,800.00 in "B" payments to 2028.[23]  Therefore, the Court's estimation of the total amount of the claim is $283,677.79, and the claim will be reduced to that amount pursuant to the order to be submitted accompanying this opinion.

Conclusion

For the reasons set forth above, this Court GRANTS Debtor's Motion to Expunge Claims numbered 2-1, 2-2, and 16-1 and DENIES Debtor's Motion to Expunge Claim 15-1, instead MODIFYING that claim and allowing it as a general unsecured claim in the amount of $283,677.79.  A conforming order will be docketed along with this opinion.

Dated:  10/1/14                          /s/Christine M. Gravelle
                                         United States Bankruptcy Judge

---

[21] See Proof of Claim 2-1
[22] The Court applies a 5.0% present value discount, which is the same as that employed by The Ridge per Exhibit B at Docket No. 150, for 17 years.  The claim is reduced to present value because the refund of the deposit would not occur until such time as The Ridge reached full membership plus enough replacement members to satisfy the waiting list.  We have estimated this date to be approximately 2028, or 17 years from the date of the judgment.
[23] The Court does not discount the "B" payments to present value because there was insufficient testimony to determine how far into the future the "B" payments must be made.  Because of the prospective nature of those payments, we will not reduce the refund to present value because we are unsure whether 17 years of payments is required.  The payments may never be made.  Since the allowed gross claim of The Ridge includes $31,800 as the amount of "B" payments to be made by Debtor, we will consider it reimbursable in full.